[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 13, 2006
THOMAS K. KAHN
CLERK

No. 06-10674
Non-Argument Calendar

_____

D. C. Docket No. 04-20139-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HECTOR PERDOMO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 13, 2006)**

Before MARCUS, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Hector Perdomo appeals his convictions and sentence for conspiracy to commit money laundering, 18 U.S.C. § 1956(h), and money laundering, id. § 1956(a)(1)(B)(i). Perdomo challenges his convictions on several grounds: (1) there was insufficient evidence to support his convictions, (2) there was an improper variance between the conspiracy charged and the conspiracy proved at trial, (3) impermissible hearsay was admitted into evidence, and (4) the district court made improper remarks regarding Perdomo's testimony. Perdomo also argues that the district court clearly erred when it denied him a minor role reduction at sentencing. See U.S.S.G. § 3B1.2(b). We affirm.

## I. BACKGROUND

On November 5, 2004, Perdomo, Mario Melo, Olga Melo, Miguel Melo, Pedro Reynolds, and Ivan Tabares were indicted for conspiracy to launder money, 18 U.S.C. § 1956(h), and money laundering, id. 1956(a)(1)(B)(I). With the exception of Perdomo, each of the defendants pleaded guilty. Perdomo proceeded to trial.

The government presented the following evidence against Perdomo. Detective Alberto Pena of the Money Laundering Strike Force of the Miami Police Department testified that Perdomo approached him and offered to act as a confidential informant in September 2002. Perdomo told Pena that he had a

2

business that sold computer parts and he had customers from Colombia who were paying with black market dollars. Perdomo signed an agreement to become a confidential informant that prohibited him to keep contraband evidence and required him to notify Pena as soon as a customer arranged to drop cash to his business, regardless of the amount.

Joel Chades, a police officer in the Internal Revenue Service Task Force of the Medley Police Department, testified that on September 24, 2002, he conducted surveillance of Mario Melo, whom they suspected of laundering drug money. Chades testified that he followed Mario Melo to the parking lot of a Costco warehouse, where Mario Melo approached a van driven by Perdomo, engaged in a brief conversation, and placed a bag or envelope in Perdomo's van. Chades testified that he followed Perdomo's van to a Sports Authority store. Chades stated that Perdomo did not take the most direct route to the Sports Authority, which was located on the same street as the Costco. Rather, Perdomo traveled on a residential street, "driving extremely slow, [sic] turning into streets, making U-turns, going into cul-de-sacs, doing counter-surveillance techniques."

Pena testified that on September 24, 2002, Perdomo called him for the first time since Perdomo became a confidential informant. Perdomo told Pena that he had "picked up a bunch of hard drives and he was delivering them to a man in a

3

parking lot" and that he was being followed. Pena stated that he believed Perdomo was lying and directed him to drive to the Sports Authority store. Pena dispatched two detectives to meet Perdomo there. Pena also testified that it "is pretty common among money launderers where they pick up currency and drop it off in these parking lots to individuals they don't even know."

Sergio Diaz, a police officer in the Internal Revenue Service Task Force of the North Miami Beach Police Department, testified that he witnessed Perdomo arrive at the Sports Authority store. Diaz stated that Perdomo was met by two men whom he subsequently learned were detectives from the Money Laundering Strike Force. Diaz testified, without objection, that the Strike Force detectives notified him that Perdomo was a confidential informant who "had received something that apparently he wasn't supposed to" and "had possibly done something wrong." Diaz found that the package in Perdomo's van contained $60,000 and placed Perdomo under arrest.

Leandro Briones, a special agent with the Internal Revenue Service, testified that he interviewed Perdomo twice. During the first interview on September 24, 2002, Perdomo stated that a man named "Jaime" told Perdomo to meet him in the Costco parking lot to deliver currency. Perdomo stated that the money was to be used to purchase computer parts on behalf of Diego Madrigal for export to

4

Colombia. Perdomo admitted that the "currency that he had received from Jaime . . . was probably from the black market peso exchange, which is derived from narcotics proceeds." In the second interview, on December 31, 2002, Perdomo identified "Jaime" to be Mario Melo.

Chades testified, without objection, to an "similar transaction" that occurred between Mario Melo and two other individuals on November 8, 2002. Chades testified that Mario Melo transferred a bag containing approximately $200,000 to Tabares and Reynolds. Chades stated that he followed Tabares and Reynolds to an airplane parts business where an additional $50,000 in cash was found.

Ron Sullivan, a special agent with the Internal Revenue Service, testified that, on November 8, 2002, he executed a search warrant on the residence of Mario Melo. Sullivan testified that he recovered a money-counting machine, an envelope similar to the one that Mario Melo passed to Perdomo, and a bag of rubber bands similar to those used to wrap bundles of currency. The search also revealed approximately $2000 distributed throughout the residence and approximately $7000 in the trunk of Mario Melo's vehicle.

At the close of the case-in-chief of the government, Perdomo moved for judgment of acquittal. The district court withheld ruling on the motion. Perdomo testified on his own behalf as the only witness for the defense.

Perdomo testified to the transaction that occurred on September 24, 2002. Perdomo stated that he received a call from "a man" who wanted to drop off money on behalf of Madrigal and whom Perdomo agreed to meet in the Costco parking lot. Perdomo stated that at the meeting, the man placed an envelope in Perdomo's vehicle, and, when Perdomo asked him what was in the envelope, informed Perdomo that it was $60,000. Perdomo testified that he had engaged in business with Madrigal before, but that the transaction involved only $6000. Perdomo stated that he called Pena immediately after discovering the envelope contained more than $6000 and cooperated fully with Pena and the other officers.

On cross-examination, Perdomo admitted to receiving three or four cash payments of $6000 or less while serving as a confidential informant without notifying Pena, but testified that Pena had told him he was not required to notify Pena of cash transactions below $10,000. Perdomo testified that, following his arrest and at the request of the agents, he called Madrigal. Perdomo admitted that, during the phone call, Madrigal expressed his belief that Perdomo was aware that he would receive $60,000 in the transaction. The following exchange then took place:

> The Court: You said you weren't expecting that amount. What amount?
> Perdomo: I was expecting—I was expecting an amount different from the price quotation I had submitted to him weeks

6

before. And I was expecting—I was expecting an amount that was indicated on this e-mail that I received on the 17th of September.

The Court: He's—ask him your question. You said you were not expecting that amount. The amount was $60,000, or three times 20. Were you expecting money at all? What were you expecting? What are you talking about? This makes no sense at all. It's gibberish.

Perdomo: I was expecting from six to $8000, round about.

Perdomo did not object to the statement of the district court.

After Perdomo's testimony, the defense rested. Perdomo did not renew his motion for judgment of acquittal, nor did Perdomo argue that the conspiracy proved at trial varied from the conspiracy charged in the indictment. The district court instructed the jury, "Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision concerning the facts." The jury returned a verdict of guilty on both charges.

In lieu of requiring the jury specially to find the amount involved in the transaction, the parties stipulated to $59,800. The Presentence Investigation Report for Perdomo used this amount to calculate the base offense level of 14. Perdomo objected that the PSI failed to recommend a minor role reduction. See U.S.S.G. § 3B1.2(b). The district court denied Perdomo's motion, calculated a total offense level of 24, a criminal history category of I, and an advisory guidelines range of 51 to 63 months of imprisonment. The district court sentenced Perdomo to 51 months of imprisonment.

## II. STANDARD OF REVIEW

This Court reviews <u>de novo</u> the sufficiency of the evidence to support a conviction. <u>United States v. Diaz</u>, 248 F.3d 1065, 1084 (11th Cir. 2001). We "view the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict." <u>United States v. Starrett</u>, 55 F.3d 1525, 1541 (11th Cir. 1995) (quoting <u>United States v. Church</u>, 955 F.2d 688, 693 (11th Cir. 1992)). "When a defendant does not move for a judgment of acquittal at the close of the evidence, . . . we will reverse the conviction only where doing so is necessary to prevent a manifest miscarriage of justice." <u>United States v. Greer</u>, 440 F.3d 1267, 1271 (11th Cir. 2006).

"We review questions of constitutional law <u>de novo</u>." <u>United States v. Brown</u>, 364 F.3d 1266, 1268 (11th Cir. 2004). This Court reviews <u>de novo</u> whether a statement of the district court was prejudicial to the defendant. <u>See</u> <u>Moody v. United States</u>, 377 F.2d 175, 177-80 (5th Cir. 1967). "[A] district court's determination of a defendant's role in the offense is a finding of fact to be reviewed only for clear error." <u>United States v. Rodriguez De Varon</u>, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

When the defendant fails to object before the district court, we reverse only for plain error. <u>United States v. Dennis</u>, 237 F.3d 1295, 1299 (11th Cir. 2001).

"An appellate court may not correct an error the defendant failed to raise in the district court unless there is: '(1) error, (2) that is plain, and (3) that affects substantial rights.'" United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied 125 S. Ct. 2935 (2005) (quoting United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting Cotton, 535 U.S. at 631, 122 S. Ct. at 1785).

### III. DISCUSSION

Perdomo raises five arguments on appeal. First, Perdomo argues that the evidence is insufficient to support his convictions for conspiracy and money laundering. Second, Perdomo argues that the district court plainly erred when it permitted the government to prove multiple conspiracies instead of the single conspiracy for which Perdomo was indicted. Third, Perdomo argues that the district court plainly erred when it admitted hearsay during the testimony of Diaz. Fourth, Perdomo argues that the district court plainly erred when it commented on Perdomo's testimony. Fifth, Perdomo argues that the district court clearly erred when it denied him a minor role adjustment at sentencing. We address each argument in turn.

9

*A. Sufficient Evidence Supports Perdomo's Convictions.*

Perdomo argues that the government failed to present evidence sufficient to support his conviction for money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), and conspiracy to launder money, id. § 1956(h). Because Perdomo failed to renew his objection to the sufficiency of the evidence at the close of his case, we review for a "manifest miscarriage of justice." Greer, 440 F.3d at 1271. In our evaluation, we view the evidence in the light most favorable to the government. Starrett, 55 F.3d at 1541. We address each conviction in turn.

1. The Government Presented Evidence Sufficient to
Support Perdomo's Conviction for Money Laundering.

To obtain a conviction under section 1956(a)(1)(B)(i), the government must prove four elements:

> (1) that appellants conducted or attempted to conduct a financial transaction; (2) that the transaction involved the proceeds of a statutorily specified unlawful activity; (3) that appellants knew the proceeds were from some form of illegal activity; and (4) that appellants knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

United States v. Majors, 196 F.3d 1206, 1212 (11th Cir. 1999). Perdomo argues that the government failed to meet its burden on the fourth element: concealment. We disagree.

10

Federal courts have found evidence of concealment in many forms. United States v. Garcia-Emanuel, 14 F.3d 1469, 1475-76 (10th Cir. 1994) (collecting cases from several circuits); see also Majors, 196 F.3d at 1213 n.18 (citing Garcia-Emanuel with approval). The Tenth Circuit listed the following examples:

> statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

Garcia-Emanuel, 14 F.3d at 1475-76 (footnotes omitted).

The evidence presented at trial is sufficient to prove concealment. Chades testified that Perdomo engaged in "unusual secrecy" for a transaction that was purportedly for the purchase of computer hardware: the transfer of the $60,000 took place in a Costco parking lot, and Perdomo used counter-surveillance techniques when he drove away with the money. Pena testified that these practices were consistent with those involved in money laundering. Perdomo testified that Mario Melo, acting as a third party, dropped the money on behalf of Madrigal. Pena's testimony also revealed that Perdomo, when he called Pena after picking up the money, lied and said the package contained computer parts. This evidence is

11

sufficient to support Perdomo's conviction for money laundering under section 1956(a)(1)(B)(i).

### 2. The Government Presented Evidence Sufficient to Support Perdomo's Conviction for Conspiracy.

"To support a conviction of conspiracy, the government must prove that an agreement existed between two or more persons to commit a crime and that the defendant knowingly and voluntarily joined or participated in the conspiracy." United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983). Perdomo argues that the government failed to prove that Perdomo colluded with Mario Melo to commit money laundering. Again, we disagree.

Perdomo's own testimony evidenced that he agreed to commit money laundering. Perdomo admitted that he agreed to meet Mario Melo to collect money on behalf of Madrigal. The same evidence that supports the element of concealment for Perdomo's money laundering conviction supports his knowledge of the illegality of the transaction to which he agreed. This evidence was sufficient to support Perdomo's conviction for conspiracy to commit money laundering under section 1956(h).

*B. The Conspiracy Proved at Trial Was Charged in the*
*Indictment and Evidence of the November 8, 2002,*
*Conspiracy Did Not Prejudice Perdomo.*

"[T]he government must prove the conspiracy it charged in the indictment rather than some other conspiracy." United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998). The government must show an 'interdependence' among the alleged co-conspirators in order to prove that the indicted conspiracy was a single unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies." Id. Smaller conspiracies are interrelated if they depend upon, are aided by, or have an interest in the success of the others. United States v. Chandler, 388 F.3d 796, 811 (11th Cir. 2004).

Perdomo argues that the September 24, 2002, transaction involving Mario Melo and Perdomo and the November 8, 2002, transaction that involved Mario Melo, Tabares, and Reynolds were two separate conspiracies instead of a single conspiracy as charged in the indictment. Because Perdomo failed to object at or before trial to this purported variance, we review for plain error. See Dennis, 237 F.3d at 1299. Because the conspiracy involving Perdomo that the government proved was charged in the indictment, no reversible error occurred.

"[P]roof of multiple conspiracies does not in itself constitute reversible error." United States v. Gafyczk, 847 F.2d 685, 693 (11th Cir. 1988). "If the

13

Government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." Id. (quoting United States v. L'Hoste, 609 F.2d 796, 801 (5th Cir. 1980)). Perdomo argues that the government failed to prove Perdomo's involvement in the conspiracy that culminated in the transaction between Mario Melo and Reynolds and Tabares on November 8, 2002. The problem for Perdomo is that the failure to prove the broader conspiracy did not affect his substantial rights. See id.

The conspiracy proved at trial was charged in the indictment. Although the conspiracy charged in the indictment was broader, the indictment listed as an overt act the September 24, 2002, transaction. As we discussed above, see supra Part III.A.2, the government offered proof that Perdomo agreed with Mario Melo to launder money on September 24, 2002. Because the indictment alleged conduct sufficient to support Perdomo's conspiracy conviction, Perdomo's substantial rights were not affected. See Gafyczk, 847 F.2d at 693.

Perdomo also cannot contend that he was unfairly prejudiced by the evidence of the November 8, 2002, transaction, which had been described in the indictment. The evidence of the November 8, 2002, transaction was minimal in contrast with the overwhelming evidence presented by the government and the testimony of Perdomo himself. Perdomo was never mentioned in connection with

14

the November 8, 2002, transaction, and the government did not cross-examine Perdomo about either the transaction or Tabares and Reynolds.

### C. The Hearsay Testimony of Diaz Did Not Prejudice Perdomo.

Perdomo argues that the testimony of Diaz contained inadmissible hearsay that violated the Sixth Amendment confrontation right of Perdomo. See U.S. Const. Amend. VI; Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004). Diaz testified that two officers from the Money Laundering Strike Force who did not testify at trial told him that Perdomo "had received something that apparently he wasn't supposed to" and "had possibly done something wrong." Because Perdomo did not object at trial, we review for plain error. Dennis, 237 F.3d at 1299.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). In a criminal trial, "testimonial" hearsay cannot be admitted unless the declarant is unavailable and the defendant has had a previous opportunity to cross-examine the declarant. Crawford, 541 U.S. at 68, 124 S. Ct. at 1374. Testimonial statements are generally those made with the expectation that they will be available "for use at a later trial." See id. at 52, 124 S. Ct. at 1364.

15

The government concedes that the statement is hearsay, but argues that admitting the statement was not plain error because there was ample evidence to prove Perdomo's guilt. We need not address whether the statement was either offered for its truth or was testimonial in nature. Given the weight of the evidence against him, Perdomo was not prejudiced by any hearsay in Diaz's testimony. Because Perdomo has not satisfied his burden to establish prejudice, we conclude the district court did not plainly err.

### D. The Comments of the District Court Relating to Perdomo's Testimony Did Not Prejudice Perdomo.

Perdomo argues, for the first time on appeal, that the comment of the district court that Perdomo's response was "gibberish" was an expression of opinion with regard to his credibility that invaded the province of the jury. We disagree. When it made the comment, the district court merely exercised its role as the "governor of the trial." Quercia v. United States, 289 U.S. 466, 469, 53 S. Ct. 698, 698-99 (1933). The district court sought to focus the testimony of Perdomo and to direct the witness to respond to the question asked.

Federal courts have long recognized the role of the district court judge as the "governor of the trial for the purpose of assuring its proper conduct." Id. at 469, 53 S. Ct. at 698-99. This role must be exercised with care because the "influence of the trial judge on the jury is necessarily and properly of great weight." Id. at 470,

16

53 S. Ct. at 699 (internal quotations omitted).  The Supreme Court "has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided'; that 'deductions and theories not warranted by the evidence should be studiously avoided.'"  Id. (quoting Starr v. United States, 153 U.S. 614, 626, 14 S. Ct. 919, 923 (1894)).

Even if the district court had expressed an opinion with regard to Perdomo's credibility, Perdomo cannot satisfy his burden to establish plain error. The jury had ample evidence upon which to find Perdomo incredible.  Perdomo's testimony was internally inconsistent, contradicted by the testimony of several of the police officers who testified against him, and often unresponsive to the questions asked by the government.  Pena testified that Perdomo had a history of lying to him, including his initial statement that he picked up "hard drives" instead of money at the Costco parking lot.  The district court also expressly instructed the jury to disregard any statements the district court made during the trial.  See United States v. Calderon, 127 F.3d 1314, 1334 (11th Cir. 1997) (stating that "a prejudicial remark may be rendered harmless by curative instructions to the jury" (internal quotation omitted)).

### E.  The District Court Did Not Clearly Err When It Denied Perdomo a Minor Role Adjustment.

17

When "the defendant was a minor participant in any criminal activity," a two-level reduction is warranted. U.S.S.G. § 3B1.2(b). "This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." Id. § 3B1.2 cmt. n.3(A). "Subsection (b) applies to a defendant described in Application Note 3(A) who is less culpable than most other participants[.]" Id. § 3B1.2 cmt. n.5. "[T]he district court must measure the defendant's role against her relevant conduct," i.e., the conduct on which the base offense level is based. Rodriguez De Varon, 175 F.3d at 934.

The relevant conduct in Perdomo's offense was the money laundering transaction in the amount of $59,800. The only participants in this transaction were Perdomo and Mario Melo. The district court did not clearly err when it found that Perdomo was not "substantially less culpable" than Mario Melo. U.S.S.G. § 3B1.2 cmt. n.3(A).

## IV. CONCLUSION

Perdomo's convictions and sentence are

**AFFIRMED**.